HOBBS *et al.* *v.* SHEFFIELD *et al.*

1. Under the facts of this case, the defendant Odom was not a trader at the time the suit praying for injunction and receiver was brought. *Comer* v. *Coates,* 69 *Ga.* 491; *Blanchard* v. *Van Syckle,* 70 *Ga.* 278; *Coates* v. *Allen,* 71 *Ga.* 787; *Scott* v. *Jones,* 74 *Ga.* 762; *Kimbrell* v. *Walters,* 86 *Ga.* 99, 12 S. E. Rep. 305.
2. The judgment enjoining the mortgage *fi. fas.* and appointing a receiver as to the property levied upon and advertised for sale is reversed, with direction that in case the proceeds of sale should yield to Hobbs and Tucker more than $4,200.00, with interest and attorney's fees thereon, the excess be held up to await the result of this litigation; and the judgment appointing a receiver as to the other effects in controversy is affirmed.

July 8, 1891. By two Justices.     *Reversed in part; affirmed in part.*

Injunction and receiver. Traders. Practice. Before Judge FORT. Lee superior court. May term, 1891.

This bill of exceptions was taken by Hobbs *et al.*, preferred mortgage creditors of Odom, to the grant of an injunction and the appointment of a receiver upon the petition of Sheffield and six other unsecured creditors, to which petition were filed answers by Odom and by the plaintiffs in error, and an answer in the nature of a cross-petition by Weston *et al.*, second mortgage

creditors. It appears that on April 8, Odom made four mortgages : (1) to Lucy A. Odom, covering other property than his stock of goods, such as real estate, cows, horses, etc., to secure notes due one day after date for the sum total $2,000 ; (2) to Hobbs and eleven other creditors, to secure them in the aggregate sum of $7,850 and ten per cent. attorney's fees, covering his entire stock of goods, wares, merchandise, books, notes and accounts, his storehouse and two vacant lots, but not covering the same realty and personalty described in the mortgage to Lucy A. Odom; (3) to Randall and five others, to secure them in the aggregate sum of $400 clerk-hire and ten per cent. attorney's fees, covering the same property described in the Hobbs mortgage, and to be equal in dignity to it and superior to the one about to be mentioned; (4) to Weston and nine others, to secure them in the aggregate sum of $8,942.69 and ten per cent attorney's fees, due the day of its date, covering the same property described in the Hobbs mortgage, and known as the second mortgage. On April 9, the Hobbs and Weston mortgages were foreclosed on the personalty described therein, by separate affidavits of ten of the mortgagees in the Hobbs mortgage, and of four of the mortgagees in the Weston mortgage. The other two mortgagees in the Hobbs mortgage made affidavits to foreclose on the personalty, on April 10 and 16 respectively; and on April 14, one of the other five mortgagees in the Weston mortgage made a similar affidavit. All these affidavits were attached to the mortgages to which they related, and were filed in the clerk's office; and executions were issued and levied.

The petition of Sheffield *et al.* was presented on April 18, and it contained these allegations: The sheriff, acting under an order of the ordinary, advertised the stock of goods for sale on April 20, and will on that day proceed to sell the same, unless restrained. Odom's

assets consist of the stock of goods of the nominal value of fifteen or twenty thousand dollars, and about the same amount of notes and accounts ; and his liabilities amount to something over $40,000. It is his manifest intention to have the stock of goods sold at a sacrifice. His purpose is to hinder, delay and defraud his creditors ; and the creditors named in the Hobbs mortgage are aiding him in his efforts to have said property sold. Many of the creditors live at a distance, and have had no time to investigate the condition of his affairs, or to arrange to be present at the sale so as to make the property bring its value. If the sale is allowed to proceed, the property will not bring half its value. Odom executed mortgages on other property in favor of his wife and his mother-in-law ; and these mortgages are fraudulent and void. In the present situation it is impossible for petitioners or any unsecured creditor to gain any information as to the true status of Odom's business ; and a receiver could sell the stock of goods to much better advantage than the sheriff, could more readily collect and preserve the assets belonging to Odom, and could, by authority of the court, compel him to pay over any moneys in his possession. He fraudulently procured the goods for which he owes one of the petitioners, about ten days before the failure, by a statement that he had in value two dollars for every one he owed. Said goods were to be paid for cash as soon as delivered.

Odom answered, admitting the indebtedness claimed by the petitioners, and his insolvency. He alleged that he executed the mortgages in good faith, to secure the several parties *bona fide* debts which he owed them. All of his property was included in the mortgages ; not one dollar was reserved ; everything that he could think of was included, so that his creditors could have the benefit of the same. It is not true that he is attempting to

hinder or delay any of his creditors; but he has done and is willing to do anything in his power to enable them to get their money. Nor is it true that the mortgage creditors are aiding or abetting him in any such arrangement or efforts; there is no combination, agreement or understanding between him and the mortgagees. He made the mortgages to secure the payment of just and *bona fide* debts. The after action of the mortgagees was not precipitated or instigated or even suggested by him; and he had nothing to do with having the mortgages foreclosed. The mortgagees had a careful inventory of the whole stock made, divided it into desirable lots and advertised the sale freely, which brought a large number of merchants from neighboring towns; and if the property had been sold as advertised, it would have sold well and for its full market value. The mortgage to secure respondent's wife and mother-in-law was for money paid to him in good faith and used by him in his business; and he was bound in honor to secure the same; there was no fraud or intention of fraud about it. He denies that he has any moneys in his hands, or reserved or held back anything of value which he has not turned over to the sheriff or included in the mortgages. He bought the goods referred to at the close of the petition, on thirty days' time; and he positively denies that he made a statement to the effect that he had in value two dollars for every one he owed, because there was no occasion to make the statement, the creditor not objecting to sell him the goods at the time. He bought them in good faith, expecting to pay for them; but afterwards, when pressed on some guano debts, he investigated his affairs, and finding himself badly embarrassed, secured the creditors set forth in the mortgages, in the utmost good faith and without any fraudulent intent.

Hobbs *et al.* made similar allegations as to good

faith and absence of fraud or of any combination between them and Odom. They foreclosed their mortgages for the purpose of collecting their claims, and had the *fi. fas.* put into the sheriff's hands for enforcement. If he had been allowed to proceed with the sale as advertised, they believe the property would have sold for its full market value. They object to the appointment of a receiver, because the sheriff is both competent and efficient and as well qualified to sell the property levied on as any one else. A receiver will result in additional fees and expenses, amounting to deducting from their already insufficient security a large sum of money which should go to their claims. It is their good fortune to be secured by Odom without any undue influence or improper conduct on their part; and that the petitioners were left out of the mortgage, is no reason why respondents should be damaged by them by delay, expenses of receivership, etc. Respondents are amply solvent, and able to respond to any suit or judgment petitioners may obtain against them; and they do not wish any assistance to collect their debts other than from the attorneys whom they have employed and by the process of foreclosure they instituted. The personalty levied on is not sufficient to pay the debts included in the mortgages; and therefore the petitioners can have no interest in it.

The petitioners filed an amendment, alleging as follows: In December, 1890, Odom, his bookkeeper and one Bridler carefully went over Odom's books to ascertain the amount of his indebtedness; and it amounted to $17,013 26. He has not bought since that time more than $2,000 worth of goods, and has borrowed about $14,000 besides such amounts as have been received from sales of goods. Petitioners believe he has been receiving all the cash he could from every source, and that a small amount of the same has been paid on his

liabilities, and the balance is now in his hands or some one for him, and ought to be paid to his creditors. On the 8th and 9th of April he removed from his store dry goods and groceries to the amount of twelve or fifteen hundred dollars, all of which should be appropriated to his creditors, and are now in his power, custody and control. Petitioners believe that the amounts represented by the mortgages are not just and *bona fide.* The whole transaction is in such shape that it is impossible to get at the truth of it without the appointment of a receiver with power to make a thorough investigation of the matter.

The answer and cross-petition of Weston *et al.* alleges as follows: The amount due them by Odom, with interest, aggregates the sum of $9,750.69. On April 8, Odom, finding himself unable to proceed in business, and feeling under special obligations to respondents and to Hobbs and Tucker and others mentioned in the mortgage, expressed his desire to prefer his creditors, and with that intention conferred with his attorney, Hobbs, who is a member of the firm of Hobbs and Tucker, the principal creditors of Odom. He stated to Hobbs that he was in a failing condition, owed more than he could pay, and desired to make an assignment; that he could not pay all his debts but felt particularly bound to Hobbs' and Tucker and to respondents; that he desired to put them on an equal footing; and that to this end he wished to make an assignment giving preference as stated. Hobbs advised him that it was difficult to make an assignment that would stand the test, and that it would be better and simpler for him to prefer his creditors by mortgage. To this advice Odom yielded, yet declaring his intention to put the creditors mentioned on an equal footing of preference. When the mortgage was about to be written, it was suggested by some one present that as there would be enough to

pay all the creditors mentioned, it would be less complicated (or something to that effect) to have two mortgages,—that it would amount to the same thing. Odom replied that he was willing any way so that the creditors mentioned were made safe and preferred alike. Though none of respondents were present or cognizant of what was going on, still they were made beneficiaries of one of the mortgages, all of which they ratified on the assurance that there would be enough to pay both mortgages, and that both sets of mortgagees should fare alike and be paid alike. Respondents deny any fraud, combination or complicity with Odom or any one else in the procurement of the mortgages. Aside from the money received by Odom in the regular line of his business, there have, since January 1, 1891, come into his hands about $15,000, consisting of $4,000 from Hobbs and Tucker, $5,050 from two of respondents, and the balance from the Commercial Bank in Albany ; but the most rigid and exhaustive search fails to show any trace or entry on his books showing what became of said money or any part of it, nor has he given respondents any satisfaction or information with regard to it. Since the making of the mortgages and his declaration of his failure, he entered into complicity whereby more than $1,000 worth of goods were taken from his store at night and carried away. It was his intention to make an assignment or such instrument as would put respondents on the same footing with Hobbs and Tucker; and he persisted in that intention, and was only prevented from carrying it into effect by the influence of Hobbs and Tucker. In the light of the confidential relations between the parties, this was a legal wrong, especially since it turns out that the assets are barely sufficient to pay the amounts named in the Hobbs mortgage ; and especially will this be true if the amounts are permitted to stand as therein named, for

the amounts which Hobbs and Tucker held against Odom did not exceed $4,200 which was not to become due until next fall, as respondents are advised. Yet Hobbs and Tucker have taken their mortgage for $5,000 besides attorneys' fees, which is unjust to respondents. They pray that Odom be required to pay over to the receiver said $15,000 so received by him, and to turn over to the receiver all the goods which he caused or permitted to be taken from the store after making the mortgages; and that upon final hearing, the court will decree that the so-called distinction between the two mortgages in question be abolished and respondents be placed on the same footing with Hobbs and Tucker, and that the claim of the latter and all other claims be reduced to proper amounts.

At the hearing there were affidavits tending to sustain the allegations of the amended petition. Odom's book-keeper testified that in his opinion, if the goods had been sold as advertised by the sheriff, they would not have brought more than twenty-five cents on the dollar, that, in his opinion, a receiver with authority to find purchasers could make the stock net 75 or 80 cents on the dollar, and that the stock invoiced over $16,000. Affidavits of respondents tended to show that the mortgages were drafted in strict accordance with Odom's instructions; that he called out the names and amounts that were put in the first mortgage, and so as to the second; that all were written exactly as he indicated they should be; that the roll of creditors was called, and he dictated in which mortgage the different creditors were placed, and the number 1 or 2 was placed opposite the several names as he called them out, and the mortgages were carefully read over to him before they were signed; and that Hobbs used no influence, directly or indirectly, to have him make the mortgages as he did, and explained to him that to make them as he did would be simpler than to make an assignment.

R. HOBBS and W. T. JONES, for plaintiffs in error.

J. W. WALTERS, B. P. HOLLIS, WOOTEN & WOOTEN, SIMMONS & KIMBROUGH and HARRISON & PEEPLES, *contra*.